UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AZUCENA AMADOR,<br><br>               Plaintiff,<br><br>     v.<br><br>SBE ENTERTAINMENT GROUP, LLC, et al.,<br><br>               Defendants. | Case No. 19-cv-06414-WHO<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 60, 61, 62, 67 |

Plaintiff Azucena Amador, who worked as a general cashier at the Clift Hotel in San Francisco, California, alleges violations of the California Fair Employment and Housing Act ("FEHA") and the California Family Rights Act ("CFRA") against two entities that operated the Clift Hotel: Morgans Hotel Group Management, LLC and its parent SBE ENT Holdings, LLC (collectively "SBE")[1], which owned it from late 2016 through May 2018, and Sonesta International Hotels Corporation ("Sonesta"), which purchased it in May 2018. SBE and Sonesta move for summary judgment on all claims asserted against them and Amador cross-moves for partial summary judgment on her failure to engage in an interactive process and failure to reasonably accommodate claims.

The motions are GRANTED in part and DENIED in part as provided below. In sum, the failure to provide reasonable accommodation, failure to engage in an interactive process, discrimination/retaliation based on failure to hire, and the derivative failure to prevent discrimination/retaliation claims, along with questions about damages for those claims, survive

---

[1] Amador originally named SBE Entertainment Group as a defendant in this case. SBE Entertainment Group moves for summary judgment on grounds that it is an entity wholly unaffiliated and unrelated to the Clift. [Dkt. No. 67]. Amador does not oppose. [Dkt. No. 74]. SBE Entertainment Group, LLC's motion is GRANTED.

summary judgment because there are material disputed facts. All other claims are dismissed. In brief summary, my reasoning is:

Failure to Engage in an Interactive Process and Failure to Provide Reasonable Accommodation (COA 2 and 3): There are triable issues of fact regarding when SBE's failure to engage occurred and whether the ergonomic assessment Amador asked for would have been provided her with an effective reasonable accommodation. SBE's and Amador's cross motions are DENIED.

Disability Discrimination and Retaliation (COA 1, 5 and 7): Amador brings these claims because of: (i) SBE's discipline of her for excessive absences and isolating her from her peers; (ii) SBE's failure to provide a reasonable accommodation; and (iii) SBE and Sonesta's failure to hire her. The first theory fails because it is based on events that are time-barred and Amador fails to establish that peer isolation constitutes an adverse employment action. The second theory fails because Amador does not make a prima facie case and fails to raise triable issues of fact on whether SBE's failure to provide reasonable accommodation was based on a discriminatory/retaliatory motive. The third theory survives because Amador has raised a triable issue of fact of pretext undermining SBE and Sonesta's legitimate and non-discriminatory reasons not to hire her, *i.e.*, to replace the general cashier position with a cash machine. Sonesta and SBE's motion is GRANTED on the first two theories and DENIED on the third theory.

Failure to Prevent Discrimination and Retaliation (COA 6): This claim is derivative of the underlying discrimination and retaliation claims. Sonesta and SBE's motion is GRANTED in part and DENIED consistent with the above.

Disability Harassment (COA 4): Amador fails to show unwelcome conduct based on a disability that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. SBE's motion is GRANTED.

Punitive Damages: The question of damages goes to the jury. SBE's motion is DENIED.

**BACKGROUND**

I. **FACTUAL BACKGROUND**

Amador worked as a general cashier at the Clift Hotel between 2001 and 2018. As a

2

general cashier, she was responsible for cash handling, pay-out of tips for the bar and restaurant, issuing "bank contracts" and cash to those employees who held banks, and maintaining oversight of a $175,000 balance in the Clift vault. Mellwig Decl. [Dkt. No. 64] Ex. 10 (cashier job description). In the mid-2000s, Morgans Clift Group Management, LLC took over management of the Clift. At the end of 2016, SBE ENT Holdings, LLC acquired Morgans and the Clift. Sonesta took over the management of the Clift in May 2018.

## A.     Ergonomic Evaluation and Work Restrictions

In February 2016, while the Clift was under SBE's management, Amador began experiencing pain on the left side of her neck, arm, and hands. Stephenson Decl. [Dkt. No. 73-1] Ex. 16 (medical record). On March 11, 2016, her doctor recommended an "ergonomic assessment on her work station." *Id.*, Ex. 17 (medical record).[2] Amador provided the doctor's note to SBE HR Director Megan Fischer. *Id.*, Ex. 18 (email record). Two weeks later, she felt pain while bending under a counter at the Clift and went to Concentra, the medical facility where Clift employees were sent when injured. *Id.*, Ex. 19 (medical record). A Concentra physician diagnosed her with repetitive motion injuries ("RMIs") and placed an order for an ergonomic evaluation. *Id.* Reports from Concentra were also faxed to Fischer.

On March 26, 2016, David Faustman, outside counsel for the Clift, advised Fischer that the Clift was not legally required to hire a consultant to conduct an ergonomic assessment, but added "it would be a good idea for [Fischer] to talk to the employee about the pain and what the employee thinks is causing it, and try to respond accordingly. . . . We don't need to hire a consultant, but we shouldn't ignore the issue either." Mellwig Decl., Ex. 26 (email record). Fischer testified that she relied on Faustman's legal advice in deciding to refuse an ergonomic evaluation, which Amador claims was never communicated to her.

Instead of scheduling an ergonomic evaluation, Fischer worked with the IT Director, Aaron Taylor, to buy ergonomic equipment for Amador's workstation, including keyboards,

---

[2] SBE submits an ergonomic evaluation that was done for Amador's workstation several years earlier on March 3, 2003. The evaluation noted a risk factor for "repetitive tasks while working with papers." *See* Mellwig Decl., Ex. 30.

mouse, mouse pad, and wrist pad, and added a keyboard tray to her workstation.  *See* Stephenson

Decl., Ex. 26 (email record); *id.*, Ex. 38 (purchase order for ergonomic keyboard, mouse, mouse

pad, and wrist pad).  In an email to Christy Chan, Amador's supervisor in the accounting

department, Taylor said, "I['']m not sure exactly what will be good for her but [I'll] at least give

her a few options to choose from," and asked "do you want me to pick more or just wait until

whoever comes and does the assessment of her work area?"  Stephenson Decl., Ex. 40 (email

record).  Chan responded "No, this is good enough.  We don't even have to tell her about [whether]

someone will be coming to assess her work area.  Just tell her we bought a couple versions so she

can try out whichever one works for her."  *Id.*; *see also id.*, Ex. 23 (April 6, 2016 email from

Amador to Fischer, Chan, and TJ Richardson, Amador's other supervisor, stating "I also

mentioned to my PT that you were going to buy the ergonomic key board, mouse [and] chair as I

needed them and she advised that it would probably be best to buy those after the workstation

evaluation is completed.  Since the workstation might have to be rearranged.").  Amador contends

that the ergonomic equipment provided to her was not effective.

In addition to the request for ergonomic evaluation, Amador's doctors also placed her on

work restrictions, including reduced six-hour workdays and frequent stretch breaks.  These work

restrictions were provided.  Chan met with Amador to discuss her job duties and identify how the

Clift could accommodate her restrictions, including reducing her hours and transitioning certain

job duties to other employees.  Mellwig Decl., Ex. 35 (email record).  From August 28, 2017 to

January 4, 2018, Amador was placed on a total temporary disability leave.  *Id.*, Ex. 37 (medical

record).  She returned to work with restrictions on January 5, 2018, but then then went on another

disability leave from April 3 to May 21, 2018 (around the time of the Sonesta conversion).  *Id.*,

Ex. 38 (medical record).

On July 4, 2016, Amador sent a complaint to Fischer, alleging that Chan and Richardson

had discriminated and harassed her due to her age.  Her complaint challenged a prior discipline

she received in January 2016 regarding cash mishandling and also noted that her ergonomic

evaluation had not yet occurred.  *See* Stephenson Decl., Ex. 33.  Fischer investigated the matter

and met with Amador, but Amador claims that Fischer never met with Chan and Richardson.  *Id.*,

Ex. 34 (July 7, 2016 investigation report).

Throughout the rest of 2016 and up until 2018, Amador continued to receive medical reports regarding her work restrictions, and she repeatedly asked for an ergonomic evaluation. *Id.*, Ex. 30 (January 6, 2017 physician work activity status report recommending no repetitive activity with left hand, five-minute breaks every hour and six-hour work days); *id.*, Ex. 36 (August 7, 2017 physician work activity status report recommending four-hour work days and five-minute breaks every 30 minutes); *id.*, Ex. 25 (January 4, 2018 medical record regarding work restrictions, including limitation to work six hours a day and restriction for "no rigorous grasping and performing repetitive hand motions (1/3 of work day) with left hand"); *id.*, Ex. 31 (February 23, 2018 record regarding work restrictions, noting that Amador "is still waiting an ergonomic evaluation from her workplace but she still had not received it. She asked for this in 2016."); *id.*, Ex. 24 (March 22, 2018 medical record noting that "all the treatment plan submitted by her worker's comp doctor have been approved" and stating "MRI/ergonomic evaluation/pain management"); *id.*, Ex. 29 (March 22, 2018 email from Fischer cancelling ergonomic evaluation "at this time upon further review").

**B.    Excessive Callouts and Subsequent Discipline**

Towards the end of 2016, Amador "called out" sick on multiple occasions, including three times in one week. In response to one of the emails, Michael Pace, the SBE General Manger, told Fischer and Chan that "it[']s time to seriously consider the automated system…" Stephenson Decl., Ex. 44 (email record). Chan asked Fischer if "there [is] anything else we can do besides asking her for a doctor's note and tracking her call outs? I understand the sensitive situation of her current [worker's comp] claim and what not, is there any way we can issue verbal or written warning for excessive call outs?" *Id.*, Ex. 39 (email record). Fischer responded asking Chan and Richardson to "send me all her call out for this year and we can determine if it[']s enough to discipline," to which Chan replied " Got it. We will compile a list of all the call outs for the whole Accounting team for this year. This way we will not be isolating her." *Id.* On January 12, 2017, Amador received a "verbal warning" disciplinary action because she "called out 5 times on 4 occurrences since November 1, 2016," which was considered "unsatisfactory attendance." *Id.*, Ex.

42 (disciplinary action form).  On March 21, 2017, Amador notified her supervisors about her work status and that she would be out for the next couple of days, to which Richardson responded to Chan and Fischer stating "You've got to be kidding me, so it starts again."  *Id.*, Ex. 35 (email record).

On March 23, 2017, Amador retained counsel and her counsel sent a notice to Fischer that Amador had been improperly disciplined for taking time off due to her medical condition, time for which she was legally entitled to under the FEHA and/or CFRA.  *Id.* Ex. 27.[3]  On August 11, 2017, Fischer reached out to Steven Benjamin, another SBE executive, reporting that Amador "who has been on modified duty for her works comp claim since March 2016 is becoming increasingly more difficult," and adding "We would like to start a conversation about how we move forward with her claim and employment at Clift."  *Id.*, Ex. 28.  Although Fischer testified that the "difficulty" she was referring to was the lack of progress in Amador's treatment, Amador contends that Fischer subsequently hired an investigator to surveille Amador to see if she was exaggerating her physical complaints.  *See id.*, Ex. 46 (October 4, 2017 investigation report).

### C.    May 2018 Conversion and the Cash Machine

In March 2018, Sonesta asked SBE, specifically Pace and Chan, to provide recommendations regarding which employees and/or positions to retain.  Pace and Chan recommended a cash machine for the accounting department that would replace the general cashier position.  Pace told Jennifer Rausch, Sonesta's HR Director, that the "lead time" for replacing the general cashier position with the cash machine would be sixteen weeks and that "We may want to have Sonesta sign the PO to get the ball rolling so we can install this as soon as possible with such a long lead time."  Stephenson Decl., Ex. 56 (email record).  In making the recommendation, Pace informed Rausch, along with Sonesta Chief Financial Officer Steve Miano, Executive Vice President of Operations Mark Sherwin, and Operations and Finance Director

---

[3] SBE submits documentation that indicates Amador's leave requests were related to her irritable bowel syndrome ("IBS") and that in May 2017 and February 2018, Amador requested FLMA leave for up to two days per month as needed intermittently due to her "chronic condition."  Mellwig Decl., Ex. 22 (Amador FLMA Paperwork).  The Clift granted Amador intermittent FLMA leave in April 2017 and February 2018.  *Id.*  Amador's briefing and exhibits primarily focus on her RMI condition.

David Rakouskas, that Amador "has been on light duty for a period of time (many months!), so many of her other duties have already been reassigned to the other team members." *Id.*, Ex. 49 (email record). He also told them that "[o]ther than count and reconcile banks, the only other task that our general cashier currently performs is to reconcile Fedex bill which could be easily reassigned," and "[o]ther general cashier related function will be replaced by the cash machine." *Id.* In a different email chain the same day, Miano stated: "The crux of the matter is question of continued employment of the current [general cashier]. It is clear that the hotel would like to take this opportunity to make a clean break. I think this strategy makes sense." *Id.*, Ex. 21. On April 4, 2018, Sherwin wrote to Pace: "FYI—we will take your recommendation and not post a General Cashier position—and David Rakouskas will work with you and [Chan] to identify what type of task force assistance you may need until we purchase the machine post conversion. There are approvals and processes that we will need to go through." *Id.*, Ex. 54. Sherwin submitted the Project Authorization Form ("PAR') to ownership on April 9, 2018. McLaughlin Decl. [Dkt. No. 61-2] Ex. I (PAR Form and Sherwin Dep. at 101:24–102:7, 105:10–24).

Around the same time, Amador, who was on temporary disability leave from April 3 to May 21, 2018, began emailing SBE and Sonesta about the application process as she did not see her general cashier position posted. *See* Stephenson Decl., Exs. 50 and 51 (email records). Amador complains that both Sonesta and SBE left her in the dark about the application process and SBE (particularly Richardson) did not let her attend an all-employee meeting on April 4, 2018 regarding the conversion process because she was on leave at the time. *Id.*, Ex. 1 (Amador Dep. at 156:3–157:25); *id.*, Ex. 3 (Fischer Dep. at 207:12–22). The next day, on April 5, 2018, Fischer suspended Amador's work email access. *Id.*, Ex. 52.

Rausch wrote to Sherwin, Miano, and another SBE executive (Bradford Maxwell) to "please confirm our intentions for [the general cashier] role" because Amador "is calling as we don't have the job posted," to which Maxwell responded: "As we discussed on Monday in our meeting, the hotel is rather adamant that we not hire this individual. I don't see any reason for us to overrule the hotel GM and DOF," *i.e.*, Pace and Chan. *Id.*, Ex. 22 (email record). In her deposition, Rausch acknowledged that Pace and Chan's adamance to get rid of Amador could

suggest a possible discriminatory motive, but she testified that she did not investigate their motivation further because "other than the fact that we were advancing the cash machine, and that was really the driver." *See id.*, Ex. 12 (Rausch 30(b)(6) Dep. at 133: 14–20).

On April 17, 2018, Rausch emailed Amador informing her that there was no general cashier position, denying her application for the accounting clerk role because Sonesta hired the incumbent employee (Tracy Lai), and offering that she may apply for further positions that become available. *See* McLaughlin Decl. Ex. G (Rausch Dep. and email record). At the time of the May 2018 conversion, Sonesta hired all of the incumbent SBE employees except Amador. Following the conversion, Lai worked approximately 15 to 20 hours per week in overtime to complete the additional duties for the six months it took for the cash machine to be fully operational. *See* Stephenson Decl., Ex. 9 (Lai Dep. at 14:18–25, 22:6–14, 75:15–76:15, 79:2–79:8). Towards the end of July 2018, Chan was instructed to issue a purchase order for the cash machine. *Id.*, Ex. 56 (email record). The Clift's asset manager, Diana Watts, testified that she approved the cash machine capital expenditure before the conversion ("March or April" 2018) and before the completion of the July 25, 2018 PAR form was signed. McLaughlin Decl., Ex. O (Watts Dep. at 296:14–22). The cash machine was installed at the Clift in November 2018. *Id.*, Ex. J (Miano Dep. at 165:5–9).

## II. PROCEDURAL BACKGROUND

On August 1, 2018, Amador filed a charge with the California Department of Fair Employment and Housing ("DFEH") stating that on May 7, 2018, she was subjected to discrimination and retaliation based on age and disability. Tantoy Decl. [Dkt. No. 63], Ex. 48. On July 25, 2019, Amador filed this action against SBE and Sonesta in San Francisco County Superior Court and the action was subsequently removed to this court. Amador brings seven causes of action against SBE and Sonesta: (i) disability discrimination; (ii) failure to provide reasonable accommodation (against SBE only); (iii) failure to engage in the interactive process to determine effective reasonable accommodations (against SBE only); (iv) disability harassment (against SBE only); (v) FEHA retaliation; (vi) failure to prevent discrimination and retaliation; and (vii) CFRA retaliation. Sonesta and SBE move for summary judgment on all claims asserted

against them.  [Dkt. Nos. 61 and 62].  Amador cross-moves for partial summary judgment on her second and third causes of action for failure to provide a reasonable accommodation and failure to engage in an interactive process.  [Dkt. No. 60].

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

## I.    CONTINUING VIOLATION DOCTRINE

SBE contends that Amador's FEHA claims are barred to the extent that the events giving rise to the claims occurred before August 1, 2017, more than one year before Amador filed her DFEH charge on August 1, 2018.  SBE does not raise this statute of limitations defense with respect to the "failure to hire" portion of Amador's FEHA claims because that occurred during the May 2018 conversion, which is within the limitations period.  The defense focuses on alleged events that occurred before August 2017: (i) disciplining her for time missed related to her

9

medical condition; (ii) ostracizing and isolating her from her peers; and (iii) failure to engage her in an interactive process and failure to accommodate her disability.

Amador argues that her claims are not barred by the statute of limitations because they are subject to the continuing violation doctrine. Under the continuing violation doctrine, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1056 (2005). The continuing violation doctrine applies when an employer's unlawful acts are: (1) sufficiently similar in kind; (2) have occurred with reasonable frequency; and (3) have not acquired a degree of permanence. *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 823 (2001).

With respect to the first set of events, Amador contends that SBE disciplined her on January 12, 2017 for calling out five times in the preceding two and a half months. *See* Stephenson Decl., Ex. 42. However, she fails to identify what continuing "sufficiently similar in kind" conduct occurred after August 1, 2017. She has not identified any other instances where she was similarly disciplined for calling out due to her medical condition. Accordingly, this portion of her FEHA claim is time-barred.

For the "isolation from her peers" allegations, the briefing and record do not clearly indicate when this conduct occurred and if it occurred with reasonable frequency. I cannot determine if this portion of her FEHA claim is subject to the continuing violation doctrine without that information. Regardless, as discussed further below, the FEHA claims that depend on these allegations fail for other reasons—Amador has not shown that the peer ostracism and isolation amounts to harassment and/or an adverse employment action.

With respect to the third set of claims involving the interactive process, Amador contends that the conduct that occurred from August 2017 to August 2018 was reasonably frequent and similar or related to the conduct that occurred before August 2017, including SBE's ongoing failure to engage in the interactive process and provide reasonable accommodation. For example, she contends that Fischer refused to schedule an ergonomic evaluation in March 2018, despite her worker's compensation provider approving the request and contacting Fischer to set it up. *See*

Stephenson Decl., Ex. 29 (March 22, 2018 email from Fischer cancelling ergonomic evaluation "at this time upon further review"); *see also* Stephenson Decl ISO Partial MSJ [Dkt. No. 60-1], Ex. 32 (March 22, 2018 email from Fischer to SBE employee Steven Benjamin, stating "I know in the past we didn't want to agree to a[n] ergonomic assessment so I asked them to hold off until we chatted."); *id.*, Exs. 30 and 31 (Amador medical report from "Pain & Rehabilitative" Medical Group dated January 29, 2018 and March 23, 2018). That is enough to show that the conduct with respect to the interactive process and reasonable accommodation was sufficiently similar in kind and occurred with reasonable frequency.

"'[P]ermanence' in the context of an ongoing process of accommodation of disability . . . should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation . . . will be futile." *Richards*, 26 Cal. 4th at 823. Amador asserts that SBE's actions did not make it clear to her that any further efforts to resolve the issue would be futile, as evidenced by Robert Mellwig, SBE's 30(b)(6) witness, who testified that SBE considered the possibility of providing an ergonomic evaluation up until the May 2018 conversion of the Clift. *See* Stephenson Decl., Ex. 8 (Mellwig Dep. at 146:10–20).

SBE argues that Mellwig was not designated to opine on SBE's decision to not provide an ergonomic assessment and thus the statement cannot be attributed to SBE. But even if I disregard Mellwig's statement, SBE has failed to make the showing (on this affirmative defense) that Amador should have been "on notice that litigation, not informal conciliation, is the only alternative for the vindication of his or her rights." *Richards*, 26 Cal. 4th at 823. SBE fails to point to any evidence that shows it "[made it] clear to [Amador] in a definitive manner that it will not be granting any such requests, thereby commencing the running of the statute of limitations." *Id.* at 823–24. It argues that the decision should have been made clear to Amador when many months passed without an ergonomic evaluation, but courts have found the continuing violation doctrine applies for much longer periods of time absent evidence from employers showing that the decision was clearly communicated to their employees. *See, e.g.*, *Jelin v. San Ramon Valley Unified Sch. Dist.*, No. 16-CV-05986-EDL, 2018 WL 11234174, at *8, *13 (N.D. Cal. Jul. 5,

2018) (finding the statute of limitations did not bar claim for failure to accommodate and failure to engage in an interactive process where employer argued that "a reasonable person would not have waited ten years to bring these claims" but failed to "put forward evidence to identify when Plaintiff should have been on notice that additional informal conciliation was futile"). For these reasons, the statute of limitations does not bar Amador's FEHA claims for failure to accommodate and failure to engage in an interactive process.

## II.     FAILURE TO PROVIDE REASONABLE ACCOMMODATION AND FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS

Section 12940(n) of FEHA makes it unlawful for an employer to "fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identifying an accommodation that allows the employee to perform the job effectively. For the process to work both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 984–85 (2008) (internal quotation and alterations omitted).

Section 12940 (m) provides that it is an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee." Cal. Gov't Code § 12940(m). "While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other." *Gelfo v. Lockheed Martin Corp.*, 140 Cal. App. 4th 34, 54 (2006). "[A]n employer's duty to accommodate is inextricably linked to its obligation to engage in a timely, good faith discussion with an applicant or employee whom it knows is disabled, and who has requested an accommodation, to determine the extent of the individual's limitations, before an individual may be deemed unable to work." *Id.* at 61.

SBE admits that it knew Amador had a physical disability and that she requested

12

accommodations for it.  It argues that it provided her with reasonable accommodations by reducing her schedule to 6-hour work days, providing more frequent breaks, and buying her ergonomically-designed chair, keyboards, mouse, mouse pad, wrist pad, and foot rest.  Amador does not dispute that she received work restrictions in the form of reduced hours and frequent breaks, but argues that her FEHA claims focus on the lack of reasonable accommodations provided to her for the time that she working, *i.e.,* physical accommodations of her workstation.  SBE's suggestion that it cannot be held liable for providing some but not all reasonable accommodations necessary for Amador to perform her job is contrary to the case law.  *See Kimbro v. Atlantic Richfield Co.*. 889 F.2d 869 (9th Cir. 1989) ("As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation.").  Focusing on the physical accommodations of her workstation, Amador concedes that she received certain equipment between April and November 2016 for her workstation but contends that the equipment provided was not effective and that SBE failed to engage in an interactive process when it saw that the equipment provided to her was ineffective.

SBE cites *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996), to argue that providing Amador with the purchased equipment and allowing her to stretch periodically was "plainly reasonable."  As the Second Circuit noted, "[w]hether or not something constitutes a reasonable accommodation is necessarily fact-specific . . . [and] determinations on this issue must be made on a case-by-case basis."  *Id.*  The facts in that case are distinguishable.  The plaintiff did not contest her employer's "willingness to accommodate her disability in a variety of ways," and conceded that her employer "provid[ed] ergonomic furniture and to allow her to move around and stretch periodically."  *Id.* at 384.  But she claimed that "by failing to assign her to work under a different supervisor, [her employer] did not satisfy the reasonable accommodation requirements of the disability acts."  *Id.*  The Second Circuit rejected that argument, finding that "nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy."  *Id.*  In those circumstances, it found that "the accommodations offered by [the employer] were plainly

13

reasonable." *Id.* at 385. There was no issue in *Wernick* about whether the ergonomic furniture initially provided was effective.

By contrast, this is not a case about getting a new supervisor. There is evidence in the record there that indicates the equipment provided was not effective at relieving Amador's pain and condition. As summarized in the above background section, Amador continued to complain about her ongoing pain and her condition deteriorated through 2016 and 2017. *See US Airways, Inc. v. Barnett* 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not accommodate a disabled individual's limitations.") (emphasis in original). SBE failed to do what Amador and her doctors repeatedly requested—get an ergonomic assessment.

Relatedly, with respect to the failure to engage in an interactive process claim under section 12940 (n), SBE again relies on the multiple forms of accommodations provided to argue that it actively participated in an interactive process. As the Ninth Circuit made clear in *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001), "the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed."[4] The plaintiff in that case suffered from an obsessive-compulsive disorder that prevented her from getting to work on time. As an accommodation, her employer permitted her to start her shift at any time within a 24-hour period. Even with this accommodation she was still unable to get to work on time and requested that she be allowed to work from home. Her employer refused her suggested accommodation and subsequently terminated her for being tardy and missing work. *Id.* at 1131–33. The Ninth Circuit held that the employer had not satisfied its duty to provide reasonable accommodations because its initial accommodation had not been effective and it failed thereafter to engage in an interactive process aimed at finding other accommodations that might

---

[4] "Inasmuch as the FEHA and the interpretative regulations in California Code of Regulations were modeled on the federal Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990 ("ADA"), decisions interpreting those laws may be useful in deciding cases under the FEHA." *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 948 (1997). In *Humphrey*, the Ninth Circuit analyzed the "state and federal disability claims together, relying on federal authority in the absence of contrary or differing state law." *Humphrey*, 239 F.3d at 1133 n. 6.

United States District Court
Northern District of California

have been more effective. *Id.* at 1138–39; *see also Nadaf–Rahrov*, 166 Cal. App. 4th at 985 ("[T]he fact that an employer took some steps to work with an employee to identify reasonable accommodations does not absolve the employer of liability under section 12940(n). If the employer is responsible for a later breakdown in the process, it may be held liable.").

Applying the reasoning in *Humphrey*, Amador contends that the keyboard, mouse, and other ergonomically-designed equipment she received only amounts to a "first attempt at accommodation" with respect to the physical reasonable accommodation she required for work. When it became apparent that these accommodations were not working (given Amador's ongoing complaints of escalating pain, increased need for leave, and repeated requests for reasonable accommodation), then SBE was required to continue to engage in the interactive process. Put differently, when SBE knew that her RMI did not abate after providing what turned out to be, as she argues, ineffective accommodations, the onus was on SBE to continue to the interactive process, whether by way of an ergonomic evaluation (her suggestion of what should have been done here) or something else.

Amador primarily relies on the testimony of Fischer, SBE's HR Director, to support her position. Although Fischer testified that she does not recall much from the "interactive process" she engaged in, she wrote to Steven Benjamin, SBE's Risk Manager, on August 11, 2018 that Amador "who has been on modified duty for a Workers' Comp claim since March 2016 is becoming increasingly more difficult." Stephenson Decl., Ex. 28 (email record). When asked about this email in her deposition, she acknowledged that "nothing ha[d] progressed" and that "it seem[ed] like the treatment was not being effective" yet she did not recall "go[ing] back to Ms. Amador and ask[ing] whether or not the accommodations that had been provided were working[.]" *Id.*, Ex. 4 (Fischer Jan. 2021 Dep. at 390:7–391:8); *see also id.*, 356:24–357:17 (testifying that "I don't recall that I observed a deterioration" and not remembering whether she saw "any improvement in [Amador's] condition during that period"); *id.*, Ex. 3 (Fisher Oct. 2020 Depo. at 132:23–133:7) testifying that she was "frustrated with the situation" because "there didn't seem to be any improvement . . . no improvement in the situation").

SBE argues that Fischer's imperfect recollection of specific actions or conversations from

15

five years ago is not determinative because the documentary evidence, including contemporaneously-created email records, and the testimony of Chan and Richardson, who directly supervised Amador, show that SBE engaged in an interactive process with Amador. SBE's cited evidence, however, does not support this contention.

For example, SBE cites an email to show that Fischer necessarily met with Amador to discuss and provide her with ergonomic equipment. *See* Mellwig Decl., Ex. 28. Exhibit 28 is an April 6, 2016 email response from Fischer to Amador in which she simply thanked Amador for providing her with a work activity status report. Chan's April 6, 2016 performance review meeting with Amador, recapped in an email Chan sent to Amador on April 7, 2016, only shows that the two discussed reducing her hours and alleviating her workload. *See id.*, Ex. 35. The email does not show that they discussed the entirety of Amador's work restrictions, particularly restrictions on Amador's repetitive movements and equipment to relieve her symptoms. Similarly, Richardson's June 29, 2016 meeting with Amador was limited to issues about Amador's work schedule. *See id.* ("Just want to follow up with our discussion and moving forward let's make sure that you're sticking to working your 6 hours as advised by your doctor. . . If for any reasons you need to modify your schedule to come in early or later we can discuss and make that change as we've been doing."). SBE also cites portions of Chan's deposition to claim that she met with Amador "at least once a month." The cited portions of the transcript reveal that she only engaged with Amador about changes to her work hours; there is no mention about the need for proper equipment needed while she is working. *Id.*, Ex. 6 (Chan Dep. at 259:8–261:8).

To the extent that SBE contends that Amador failed to play her part in the interactive process, the record does not support that argument either. SBE faults Amador for not making a good faith attempt to satisfy her needs through the means it offered to her. Specifically, it points out that Amador first declined the ergonomic chair offered to her, but three months later in October 2016 requested the same ergonomic chair as her co-worker, Tracy Lai, which SBE then purchased for her. When Amador initially rejected the chair in July 2016, she told Fisher: "Taking my height and size of my desk into consideration it is probably best to have my workstation evaluated. At this time I would pass on ordering this chair." Stephenson Decl., Ex. 33 (email

record).  Amador testified that it was her understanding that suitable equipment such as a chair would naturally follow an ergonomic assessment and its resulting recommendations, and by asking for her ergonomic assessment she would eventually receive an appropriate chair.  *Id.*, Ex. 5 (Amador Dep. at 59:11–60:2).  In October 2016, when more than seven months passed that Amador was waiting for an ergonomic evaluation, she finally told Fisher to purchase her a "chair like Tracy's."  *id.*, Ex. 42 (email record).

Based on the evidence presented by the parties, there are triable questions of fact of if and when the interactive process fell through.  The evidence SBE provides does not clearly establish that it engaged in an interactive process as it pertains to the physical accommodations Amador needed.  On the other hand, the evidence Amador relies on, including Fischer's spotty testimony, does not clearly indicate that SBE necessarily failed to engage in an interactive process and when such a failure occurred.  Neither party is entitled to summary judgment on these claims.

To prevail on a claim for failure to engage in the interactive process, Amador must "identify a reasonable accommodation that would have been available at the time the interactive process occurred."  *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 379 (2015); *see id.* (finding "the employee should be able to identify specific, available reasonable accommodations through the litigation process, and particularly by the time the parties have conducted discovery and reached the summary judgment stage"); *Nadaf-Rahrov*, 166 Cal. App. 4th at 983 ("[T]he availability of a reasonable accommodation (*i.e.*, a modification or adjustment to the work place that enables an employee to perform the essential functions of the position held or desired) is necessary to a section 12940(n) claim").  Here, relying on the testimony of her ergonomic expert witness, Dr. Bradley Chase, Amador claims that had SBE performed an ergonomic evaluation, as her doctors requested, she would have been effectively accommodated for her disability.

Before addressing Dr. Chase's expert report, I address the legal arguments SBE raises with respect to the ergonomic evaluation.[5]  SBE disputes that it was obligated to undertake the specific

---

[5] SBE does not argue that doing the evaluation or providing her the correct ergonomic equipment would have been unduly expensive or would have eliminated any essential job functions.  *See* Stephenson Decl. [Dkt. No. 60-1], Ex 27 (email between Fischer and Steven Benjamin (Benjamin suggesting that "loss control guy from Zuricich . . . probably can do the work station ergonomic

United States District Court
Northern District of California

ergonomic assessment that Amador preferred and to choose the "best" accommodation for her. *See Wilson v. County of Orange*, 169 Cal. App. 4th 1185 (2009); *Soldinger v. Northwest Airlines, Inc.*, 51 Cal. App. 4th 345, 370 (1996) ("[T]he employer need not adopt the most reasonable accommodation nor must the employer accept the remedy preferred by the employee."). It relies on *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215 (1999) for the proposition that liability for failure to engage in an interactive process presupposes that an employee was not offered any reasonable accommodation. The employer in that case granted its meat cutter employee an extended leave of absence and offered him the only vacant job (meat clerk) for which he was qualified when he returned. The employee rejected the offered job and was terminated when he did not return from leave. The court found that the employer had satisfied its duty to provide reasonable accommodations as a matter of law, finding that the employer was not required to offer the employee the additional accommodations he requested (including ergonomic knives and other equipment) because the accommodations it did offer were less expensive and equally effective. *Id.* at 228.

SBE's reliance on *Hanson* is misplaced. Amador argues that the accommodation offered was not reasonable or effective, not that SBE failed to offer her the particular "best" accommodation of her choosing. She contends that if SBE conducted an ergonomic evaluation, as her doctors suggested, then SBE would have been able to find a reasonable and effective accommodation for her physical work restrictions. *Hanson* is also inapplicable because SBE does not contend that it reassigned Amador to a different role (as the meat cutter in *Hanson* who was offered a meat clerk position that involved less prolonged standing). All that SBE can muster is that Fischer purchased ergonomic equipment with the help of someone from the IT department, who told Fischer that he is "not an expert" in ergonomics and was "not sure exactly what will be good for [Amador]." Stephenson Decl., Ex. 35 (email record).

SBE also argues that an ergonomic assessment was not legally required pursuant to

_____

evaluation with no cost although new equipment would cost us" to which Fischer replied "It is not really a cost issue. . . but we do not want her desk evaluated for other reasons").

California Code of Regulations, Title 8, section 5110. The issue here is not that SBE was legally required to provide an ergonomic assessment at the beginning of the process, when it initially received Amador's doctor note in March 2016. Rather, the issue is whether SBE failed to engage in an interactive process when the physical accommodations it provided (the keyboard, mouse, etc.) turned out to be ineffective as Amador's condition persisted and her doctors continued to recommend an ergonomic evaluation (including in January and March 2018).

While SBE's legal arguments are unpersuasive, Amador has not identified a "specific, available reasonable accommodation[]" available during the interactive process that would support a summary judgment ruling in her favor. *Nealy*, 234 Cal. App. 4th at 379. Amador argues that conducting the ergonomic evaluation recommended by her doctors would have been one way to figure out what equipment would be reasonable and effective. Dr. Chase, Amador's expert, testifies that the use of generic "ergonomic" equipment that is not properly suited for and fitted to an individual's specific circumstances can actually have deleterious health effects by unintentionally increasing risk for injury. *See* Stephenson Decl., Ex. 58 (Dr. Chase Expert Report ¶¶ 11, 13). In Dr. Chase's opinion, Amador "would have benefited from ergonomic accommodations that followed the recommendations of a certified ergonomist resulting from a proper workstation assessment" and that "[p]roper ergonomic accommodations in Ms. Amador's case would almost certainly have reduced her experience of pain resulting from her RMI and significantly mitigated the harmful consequences to the affected nerves, muscles, and bony structures, due to long term exposure to RMI." *Id.* ¶¶ 7, 12.

Dr. Chase's testimony, to the extent admissible,[6] only establishes the recommended

---

[6] SBE argues that Dr. Chase's opinions are inadmissible on multiple grounds. The parties did not adequately brief these issues and I need not rule on SBE's evidentiary objections because my order does not turn on whether Dr. Chase's expert opinion is admissible. SBE may renew its objections as appropriate in pre-trial motions. That said, I note that other courts have found ergonomic expert opinions admissible even if the expert did not personally evaluate the exact workstation at issue. *See, e.g.*, *Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 389 (S.D.N.Y. 2017) (ergonomics expert "could permissibly rely on materials other than personal observations of [the employee] to form his opinions about the ergonomic risk factors present in [the employee's] particular workplace") (citing cases). To the extent that SBE questions the ergonomic science itself, courts have recognized that "ergonomics is an accepted scientific field" and that there is a "'wealth of research' and scientific literature supporting 'the general theory that exposure to recognized ergonomic risk factors' can cause certain injuries." *Id.* at 390 (citing

19

process SBE should have taken (performing the ergonomic evaluation), which in turn would have possibly led to identifying an effective reasonable accommodation. Performing an ergonomic evaluation is not the available reasonable accommodation itself, but rather the precursor to what an available reasonable accommodation would be. To prevail on her claim, Amador will have to prove that conducing an ergonomic assessment as her doctors advised would have led to an effective reasonable accommodation. Dr. Chase's testimony alone cannot get Amador over that hurdle at this stage.

Because triable issues of fact remain about when the interactive process fell through and whether an effective reasonable accommodation was available, SBE and Amador's motions for summary judgment on the second and third claims for failure to provide a reasonable accommodation and failure to engage in an interactive process are DENIED.

## III. DISCRIMINATION

"California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination," including disability discrimination, based on a theory of disparate treatment. *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03 (1973). The employee has the initial burden to establish a prima facie case, wherein she must "at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not" that such actions were based on discriminatory criterion. *Guz*, 24 Cal.4th at 355. The burden then shifts to the employer, who may overcome the employee's prima facie case with evidence that the employment action was taken for a legitimate, nondiscriminatory reason. *Id.* at 356. The employee may attack the employer's proffered reasons as pretext for discrimination or offer other evidence of discriminatory motive. *Id.*

To establish a prima facie case of disability discrimination, Amador must show: (1) she was a member of a protected class, (2) was qualified for the position and able to perform its

cases); *see also Powers v. Union Pac. R. Co.*, No. CIV A 907-CV-212-TH, 2009 WL 734707, at *3 (E.D. Tex. Mar. 19, 2009).

20

essential job functions, (3) suffered an adverse employment action, and (4) the adverse employment action was motivated by the protected classification. *McDonnell Douglas*, 411 U.S. at 802; *Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011) (citing *Guz*, 24 Cal.4th at 355). There is no meaningful dispute that Amador has met the first two elements: that she was disabled and was qualified for the position.[7] The crux of the dispute here is whether Amador can meet her prima facie burden with respect to the third and fourth elements (that she experienced an adverse employment action that is linked to her disability), whether SBE and Sonesta have offered a legitimate, nondiscriminatory reason for the adverse employment action, and whether Amador has raised triable issues of fact that the proffered reasons are pretext for discrimination.

Amador brings her discrimination claim based on the following three alleged adverse employment actions: (i) SBE disciplining her for excessive callouts in January 2017 and shunning and isolating her; (ii) SBE failing to provide her a reasonable accommodation; and (iii) both SBE and Sonesta for failing to hire her. As discussed above, her FEHA claim with respect to the January 2017 discipline is time-barred. *See supra* section I. The peer isolation allegations do not amount to harassment, *see infra* section VI, and Amador fails to show how it would amount to an adverse employment action either. Thus, the only adverse employment actions discussed here are SBE's failure to provide her a reasonable accommodation and SBE/Sonesta's failure to hire her.

### A. Failure to Provide Reasonable Accommodation

#### 1. Prima Facie

Assuming that failure to provide a reasonable accommodation constitutes an adverse employment action, SBE argues that Amador fails to make a prima facie case because she lacks the requisite causal connection between that decision and her protected classification, *i.e.*, that

---

[7] Sonesta argues that Amador is not member of a protected class because, in response to a question on the job application she filled out in April 2018 for the accounting clerk position (which eventually went to incumbent employee Lai), she attested that she is *not* disabled. A single response to a job application question does not stand against the ample evidence that Amador is member of a protected class. In addition, Sonesta contends that Amador cannot be considered qualified and able to perform the general cashier job because her "injuries" impacted her performance. Sonesta raised this argument for the first time in its reply brief, and even then, does not explain why it thinks Amador cannot make such a showing. Both arguments are therefore not well taken.

SBE failed to provide her an ergonomic evaluation because of her disability protected classification. A causal nexus requires evidences that suggests more than "suspicions of improper motives" that "are primarily based on conjecture and speculation." *Crosier v. United Parcel Service, Inc.*, 150 Cal. App. 3d 1132, 1139 (1983). SBE contends that Amador merely speculates that her disability played a role in SBE's decision not to conduct the ergonomic evaluation, despite the conceded fact that SBE provided other forms of accommodations with respect to her work restrictions.

Amador does not properly respond to this argument in her opposition brief. Under her prima facie burden of proof, she only focuses on SBE's alleged discriminatory animus with respect to her second theory (failure to hire). [Dkt. No. 73] at 17–18. Under her burden of proof for pretext, she tries to undermine SBE's legitimate non-discriminatory reasoning (that an ergonomic assessment was not legally required) based on her expert's, Dr. Bradley, testimony that an ergonomic evaluation was reasonable and necessary. While that argument provides some support for her FEHA failure to provide reasonable accommodation and failure to engage in an interactive process claims discussed above, it does little to show how a failure to provide an ergonomic evaluation was necessarily tied to SBE's discriminatory animus against her disability protected classification.

Amador has not met her burden of establishing a genuine dispute of any material fact on the issue of causal connection and thus has not established a prima facie case of discrimination based on SBE's failure to accommodate. SBE's motion for summary judgment with respect to this portion of Amador's discrimination claim is GRANTED. To be clear, Amador's second and third cause of action for failure to engage in an interactive process and failure to provide reasonable accommodation survive summary judgment adjudication, *see supra* section II, but her disability discrimination claim based on those two alleged failures is dismissed.

### B. Failure to Hire

Amador brings her failure to hire theory against both SBE and Sonesta. Before conducting the *McDonnell Douglas* burden-shifting analysis, I address the preliminary issue raised by the parties regarding which entity can be held liable for the final hiring decision. SBE argues that it

cannot be held liable because Sonesta made the final decision. But as further discussed below, there is ample evidence that SBE was heavily involved in Sonesta's hiring decision. After all, Sonesta directly asked SBE, particularly Pace and Chan, to provide them with recommendations on which employees and/or positions to retain. Pace and Chan stayed on as part of the Clift management team under Sonesta after the May 2018 conversion.

Sonesta cannot escape liability simply because it never employed Amador; an employer's discriminatory refusal to hire applies to both an employee and a job applicant. Amador invokes two theories to establish Sonesta's liability for failure to hire: Sonesta executives' discriminatory intent; and, alternatively, pursuant to the Cat's Paw theory, the discriminatory intent of the SBE (soon to be Sonesta) employees to whom Sonesta deferred in its decision not to hire her.[8] The parties spend much time debating whether the Cat's Paw theory applies in these circumstances given that Sonesta and SBE are separate entities and not common employers or subordinate/supervisor of each other. But whether or not this case involves a classic Cat's Paw theory, Amador has presented enough evidence for a reasonable juror to find that Sonesta had a discriminatory motive without imputing SBE's discriminatory motive on Sonesta.

Sonesta officials, including HR Director Rausch, concede that Pace told them that Amador was on leave for "multiple months!" but contend that they did not know the reason for her limited duty or anything else about her prior employment history. *See* Stephenson Decl., Ex. 49. Although Rausch claimed in her deposition that she knew nothing about Amador, Fischer testified that Rausch made detailed inquires concerning all SBE employees, including Amador and any issues related to her. *Id.*, Ex. 3 (Fischer Oct. 2020 Dep. at 236:16–237:2) (testifying that Rausch sought recommendations on "everyone . . . including Amador" and that "Sonesta was interested to

---

[8] The California Court of Appeal's discussion of the Cat's Paw theory in *Reeves v. Safeway Stores, Inc.*, 121 Cal. App. 4th 95, 113 (2004) explains how it could be applicable in the employment discrimination/retaliation context: "To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action. If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer."

know who was performing and what, you know, issues we had").  Notably, Rausch admitted that she did not investigate whether Pace or Chan's motivation was improper, particularly after receiving the email where Pace told Sonesta officials that Amador was out for "many months!" and Sonesta officials recognized that both of them were "rather adamant" about not retaining Amador.  *See id.*, Exs. 22, 49 (email records) and Ex. 3 (Rausch 30(b)(6) Dep. at 115:11–121:10, 133:13–20).

Amador presents evidence that suggests that Miano (Sonesta's CFO) was also aware of SBE's improper motives.  Chan testified that she spoke with Miano about "the operational needs of [her] department" and shared "her view that [Amador] was performing only at a two" and that she was "out . . . on and off" and "a lot" over the last couple years and was presently on "extended medical leave."  *See id.*, Ex. 6 (Chan Dep. 53:1–55:24, 57:1–13).  Chan further testified that she told both Miano and another Sonesta official, Rakouskas (the Operations and Finance Director), that Amador's "medical leaves were impacting the operational efficiency of [her] department[.]"  *id.*, at 59:13–24.  She explained that one of the reasons she recommended they not hire Amador in particular was because "she was frequently out on medical leave."  *Id.* at 61: 1–7.

Amador's theories imputing liability on both SBE and Sonesta for their refusal to hire her are sufficiently supported by the record to survive summary judgment.

### 1. Prima Facie

Amador "must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters v. United States*, 431 U.S. 324, 358 (1977).  "[A] plaintiff's prima facie burden is minimal." *Caldwell v. Paramount Unified School Dist.*, 41 Cal.App.4th 189, 197 (1995).

Amador offers the following to create an inference that SBE and Sonesta's decision to eliminate the general cashier position was motivated by discrimination: (i) there was a period of at least six months until the cash machine purchase was formally approved by Sonesta executives (July 2018) and installed and operational (November 2018); (ii) the general cashier position continued to exist past the May 2018 conversion given that Lai, the accounting clerk, had to work overtime to perform the duties until the cash machine was installed; (iii) Sonesta executives were

aware that Amador had been on and off leave "a lot" over the last couple years and was on extended medical leave at the time the decision not to hire her was made; (iv) Pace and Chan expressed adamance about being rid of Amador and Sonesta's Director of HR, Rausch, acknowledged that the adamance could suggest a possible discriminatory motive. This is sufficient for Amador to satisfy her initial prima facie burden.

### 2. Legitimate Non-Discriminatory Reason

Proceeding to the second step, the burden shifts to SBE and Sonesta to articulate a legitimate nondiscriminatory reason for their failure to hire Amador. Both contend that they had a valid reason for installing a cash machine rather than staffing a general cashier position.

Pace testified that he considered purchasing a cash machine as early as the second quarter of 2015. *See* McLaughlin Decl., Ex. H (Pace Dep. at 172:19–173:6.) In May 2017, Chan prepared a "return of investment" ("ROI") analysis on purchasing the cash machine, but SBE executives ultimately decided not to proceed due to cost and timing, particularly because the Clift was undergoing a management conversion with Sonesta. *See* Mellwig Decl., Ex. 41 (May 17, 2017 email with attached ROI); Tantoy Decl., Ex. 6 (Chan Dep. at 240:24–241:19).

Before the May 2018 conversion, Pace presented the ROI to Sonesta executives and recommended that Sonesta purchase a cash machine. Sonesta notes that general cashier positions are generally rare in their hotels; there are only two general cashier positions in their other fifty properties. *See* McLaughlin Decl., Ex. G (Rausch Depo. 81:6–21); *id.*, Ex. J (Miano Dep. 62:11–63:5). Sonesta claims that it was already familiar with the advantages a cash machine provides, including: (i) the cash machine facilitated tracking of money in a near real-time manner, making audits of the various employees' banks simpler, more efficient, and more frequent; (ii) the cash machine guaranteed employee access to cash 24/7, something that a general cashier would never be expected to provide, especially on weekends, vacation, or other absences; and (iii) the cash machine enables the Clift to more efficiently meet the requirement to pay the wait staff their tips at the end of each shift. Accordingly, on or about April 4, 2018, Miano and Sherwin (Executive Vice President of Operations) decided to purchase the cash machine and eliminate the general cashier role. *See* McLaughlin Decl., Ex. I (Sherwin Dep. 40:21–41:9); *id.*, Ex. J (Miano Dep.

114:24–116:22).

SBE and Sonesta have satisfied their burden to show that there was a legitimate, nondiscriminatory reason for the decision to not hire Amador and replace the general cashier position with a cash machine.

### 3. Pretext

The burden shifts back to Amador to prove that SBE and Sonesta's asserted reason is pretextual. A plaintiff can prove pretext either (i) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (ii) directly, by showing that unlawful discrimination more likely than not motivated the employer. *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015). Only a small amount of direct evidence is necessary in order to create a genuine issue of material fact as to pretext, whereas circumstantial evidence of pretext must be "specific and substantial" to survive summary judgment. *Bergene v. Sal River Project Agr. Imp and Power Dist.* 272 F.3d 1136, 1142 (9th Cir. 2001). Summary judgment is improper if the evidence taken as a whole (1) creates a factual issue as to whether the employer's stated reasons were what actually motivated the employer and (2) creates a reasonable inference of discriminatory motive. *Zeinali v. Raytheon Co.*, 636 F.3d 544, 553–54 (9th Cir. 2011).

The 2016/2017 emails among SBE officials and the series of emails between SBE and Sonesta executives leading up to the May 2018 conversion raise a triable factual issue whether the stated business reason is pretextual. For instance, when Amador's supervisors felt that she was calling out sick too frequently at the end of 2016, they reached out to Fischer, recognizing the "sensitive situation of her current [worker's comp] claim" but asking if there was "any way we can issue verbal or written warning for excessive callouts." Stephenson Decl., Ex. 39. They decided to "compile a list of all the call outs for the whole Accounting team for this year" so that "we will not be isolating her." *Id.* Amador was subsequently disciplined in January 2017. *Id.*, Ex. 42.

Their frustration appeared to grow as she continued to call out sick. *See id.*, Ex. 44 (December 9, 2016 email from Pace to Fischer and Chan telling them that it is "time to seriously consider the automated system . . ."); *id.*, Ex. 35 (March 21, 2017 email from Richardson to Chan

26

and Fischer stating "You've got to be kidding me, so it starts again," when Amador notified her supervisors about her work status). By the end of 2017, Fischer sent an email to SBE executive Steven Benjamin, telling him that "Amador our General Cashier who has been on modified duty for her workers comp claim since March 2016 is becoming increasingly difficult." *Id.*, Ex. 28. Fischer wanted to "start a conversation about how we move forward with her claim and employment at Clift," adding that she had already spoken to outside counsel about it. *Id.*

Against that backdrop, a reasonable juror could find that the May 2018 conversations around replacing the general cashier position with a cash machine were motivated by discriminatory animus instead of legitimate business reasons. When Pace made his recommendation to replace the general cashier position with a cash machine, he told Rausch, along with other Sonesta executives Miano, Sherwin, and Rakouskas, that Amador "has been on light duty for a period of time (many months!), so many of her other duties have already been reassigned to the other team members." Stephenson Decl., Ex. 49. Sherwin wrote to Pace the same day stating: "The crux of the matter is question of continued employment of the current [general cashier]. It is clear that the Clift would like to take this *opportunity to make a clean break*. I think this *strategy* makes sense." *Id.*, Ex. 21 (emphasis added).

Amador argues that Sonesta's endorsement of this "strategy" means that it agreed to manipulate the hiring process to prevent a specific individual from being hired, even though some of the general cashier duties would still have to be performed until final approval and installment of the cash machine. Sonesta responds that it was well within reason for it to not want to incur the expenses linked to hiring Amador and laying her off shortly thereafter, including that it would impact their state unemployment rating. It fails to present countering evidence showing that it considered the potential cost of terminating Amador once the cash machine installed, instead of during the time of conversion.

As another example, on April 4, 2018, Rausch sent an email to Miano and Sherwin asking them to confirm "our intention for this role" because Amador had been "calling as we don't have the [general cashier] position posted." Stephenson Decl., Ex. 22. Miano responded: "As we discussed on Monday in our meeting, the Clift is *rather adamant that we not hire this individual.*

1    I don't see any reason for us to overrule the Clift GM and DOF," *i.e.*, Pace and Chan. *Id.*

2    (emphasis added). In her deposition, Rausch acknowledged that Pace and Chan's adamance to get

3    rid of Amador could suggest a possible discriminatory motive, but she testified that she did not

4    investigate their motivation further because "other than the fact that we were advancing the cash

5    machine, and that was really the driver." *See id.*, Ex. 12 (Rausch 30(b)(6) Dep. at 133: 14–20);

6    *see also id.* at 130: 7–12 ("Q: So when you saw this response, 'The Clift is rather adamant that we

7    not hire this individual,' did that -- was this another time when it raised a specter to you that it was

8    very specific to Cena Amador? The desire not to hire her? A: It does."); *id.* at 132: 13–21

9    (acknowledging that "Clift being rather adamant that they not hire Cena Amador raised at least the

10   possibility of improper motives"). A reasonable juror could read these email exchanges as

11   focusing more on using the conversion opportunity to get rid of Amador and less about the

12   business reason of buying a cash machine.

13       Amador argues that the timing of the cash machine purchase further undermines SBE and

14   Sonesta's proffered reasoning. Sonesta made the decision not to hire Amador on April 4, 2018,

15   yet the authorization to purchase the cash machine came months later (in July 2018) from Diana

16   Watts, the asset manager. Stephenson Decl., Ex. 22 and Ex. 56. While Sonesta argues that the

17   delay in actually purchasing the cash machine was merely logistical to meet audit responsibilities,

18   a reasonable juror could find that argument unpersuasive viewing the record as a whole.

19       Amador has presented "specific and significantly probative evidence" that the proffered

20   reasons are pretextual. *Byrd v. Donahoe*, No. C 11-4230 RS, 2013 WL 1962304, at *4 (N.D. Cal.

21   May 10, 2013). SBE and Sonesta's motion for summary judgment on Amador's first cause of

22   action for disability discrimination based on a failure to hire is DENIED.

23   **IV.    RETALIATION**

24       Amador's fifth and seventh causes of action for FEHA retaliation and CFRA retaliation

25   rely on the same theory as the FEHA discrimination cause of action and are subject to the same

26   burden-shifting test from *McDonnell Douglas* applied above. *See Morgan v. Regents of Univ. of*

27

28

                                            28

*Cal.*, 88 Cal.App.4th 52, 67-69 (2000); *Wills v. Super. Ct.*, 195 Cal.App.4th 143, 172-173 (2011).[9]

To establish a prima facie case of retaliation, Amador must show: (1) she engaged in a protected activity, (2) the employer subjected her to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. *Morgan v. Regents of the University of California*, 88 Cal. App. 4th 52, 69 (2000).

Amador contends that she engaged in the following protected activities: (i) Amador's July 4, 2016 formal complaint of harassment and age discrimination to Fisher; (ii) her retention of counsel and counsel's March 23, 3017 letter to Fischer, in which SBE was put on notice of their recent (January 2017) improper discipline of Amador for taking time off dur to her medical condition; (iii) exercising her right to take CFRA leave; and (iv) her verbal complaints/reports that she had not yet received the ergonomic evaluation requested by her physicians and had not been accommodated. She alleges that the following retaliatory adverse employment actions were taken against her: (i) subjecting her to discipline for missing time due to her disability and shunning and isolating her; (iii) failure to provide reasonable accommodation; and (iv) failure to hire.

As discussed above, *see supra* section I, claims stemming from the January 2017 disciplinary action are time-barred and not subject to the continuing violation doctrine. Amador also fails to show that the peer isolation and ostracism amounts to harassment and/or an adverse employment action. *See infra* section VI. The retaliation claim based on a failure to accommodate fails for the same reasons discussed in section III.A.I with respect to her discrimination claim—Amador has failed to make a prima facie case that suggests SBE failed to accommodate her due to her disability. However, as discussed in section III.B.3 with respect to her discrimination claim, the retaliation claim based on failure to hire survives because Amador

---

[9] Sonesta raises a separate argument with respect to the CFRA claim. It argues that it never employed Amador and Amador never requested CFRA leave from Sonesta. Amador clarifies that her CFRA claim is brought on the same grounds as her FEHA discrimination and retaliation claims. Sonesta responds that the claim still fails because Amador has not offered evidence that she sought to exercise CFRA rights while working for SBE. Not so. In Amador counsel's March 23, 2017 letter to Fischer, states: "I also write to put you on notice that Ms. Amador is entitled to intermittent FMLA and/or CFRA leave to accommodate one or more medical conditions." Stephenson Decl., Ex. 27. As discussed above, the CFRA claim will be analyzed under the same *McDonnell Douglas* test as the FEHA discrimination and retaliation claims.

1    has raised a triable issue of fact of pretext undermining SBE and Sonesta's legitimate and non-

2    discriminatory reasons not to hire her.

3         SBE and Sonesta's motion for summary judgment on Amador's retaliation claims is

4    GRANTED in part and DENIED in part.

5    **V.    FAILURE TO PREVENT DISCRIMINATION AND RETALIATION**

6         FEHA prohibits an employer from "fail[ing] to take all reasonable steps necessary to

7    prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k).  The parties

8    agree that Amador's failure to prevent claim stands and falls with her underlying discrimination

9    and retaliation claims.  SBE and Sonesta's motion for summary judgment on Amador's sixth

10   cause of action failure to prevent is GRANTED in part and DENIED in part consistent with the

11   above discussion in sections III and IV of this order.

12   **VI.   HARASSMENT**

13        FEHA prohibits harassment of an employee or applicant.  Cal. Gov't Code § 12940(j)(1).

14   To establish a claim for harassment, a plaintiff must demonstrate that: "(1) plaintiff is a member of

15   a protected group; (2) plaintiff was subjected to harassment because he belonged to this group; and

16   (3) the alleged harassment was so severe that it created a hostile work environment."  *Huck v.*

17   *Kone Inc.*, No. C 10–01845 RS, 2011 WL 6294466, at *11 (N.D. Cal. Dec. 15, 2011) (citing

18   *Aguilar v. Avis Rent A Car Sys., Inc.*, 21 Cal.4th 121, 130 (1999)).

19        In contrast to discrimination claims, "harassment consists of conduct outside the scope of

20   necessary job performance, conduct presumably engaged in for personal gratification, because of

21   meanness or bigotry, or for other personal motives.  Harassment is not conduct of a type necessary

22   for management of the employer's business or performance of the supervisory employee's job."

23   *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 63 (1996); see *also Reno v. Baird*, 18 Cal.4th

24   640, 645–46 (1998); *Roby v. McKesson Corp.*, 47 Cal.4th 686, 706 (2009).  Thus, whereas a

25   discrimination claim could include a personnel decision, a harassment claim must be based on

26   conduct that is avoidable and unnecessary to job performance.  *Janken*, 46 Cal. App. 4th at 64.

27        Amador contends that she was subjected to hostility from her supervisors and that her

28   supervisors actively encouraged her peers to subject her to regular and escalating levels of

30

ostracism. With respect to her supervisors, she cites *Roby v. McKesson Corp.*, 47 Cal.4th 686, 709 (2009), where the California Supreme Court held that "[a]cts of discrimination provide evidentiary support for a harassment claim by establishing discriminatory animus on the part of the manager responsible for the discrimination, thereby permitting the inference that rude comments or behavior by that same manager was similarly motivated by discriminatory animus." Accordingly, "[n]othing prevents a plaintiff from proving these two violations with the same (or overlapping) evidentiary presentations." *Id.*

The *Roby* court emphasized that "distinctions place discrimination and harassment in separate categories in regard to application of the FEHA" because "discrimination refers to bias in the exercise of official actions on behalf of the employer, and harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." 47 Cal.4th at 707. But it held that "nothing in the FEHA requires that the evidence in a case be dedicated to one or the other claim but never to both," and found the evidence in the case before it was "ample to support the jury's harassment verdict" that the hostility was pervasive and effectively changed the conditions of the plaintiff's employment. *Id.* at 710. The evidence included not only the supervisor's rude comments and behavior, which occurred on a daily basis, but also the supervisor's shunning of the plaintiff during weekly staff meetings, the belittling of the plaintiff's job, and the supervisor's reprimands of the plaintiff in front of coworkers. *Id.*

The evidence Amador provides here, viewed in light most favorable to her, does not rise to that level, nor has she raised issues of material fact that would preclude summary judgment. In addition to the allegations discussed above, she contends that beginning in March 2016 and continuing through April 2018: (i) Chan actively encouraged her co-workers to not talk to her; (ii) a new employee was told to stop having lunch with her; and (iii) her birthday was not celebrated while other birthdays were. Amador cites the deposition of Tracy Lai, the accounting clerk, who testified that Chan told her that Amador was "very troublesome" and "very annoying," and that she made those comments once or twice a year. Stephenson Decl., Ex. 9 (Lai Dep. at 38:14–39:13). Amador argues that Chan's comments to Lai had the predictable effect of making Lai reluctant to be seen talking to her given that Lai testified that she "would be on alert about this because I knew

31

[Chan] did not like it." *Id.* at 96:21–23. However, Lai went on to add: "But sometimes when I got busy, I might not have time to pay close attention to this kind of affairs. So unless I have some extra time, I would not go and talk to Ms. Amador to -- for like casual chatting or something." *Id.* at 96:23–97: 3. When asked if she stopped talking to Amador after Chan expressed that she found Amador to be trouble, Lai responded: "I would not say so. I did not completely stop my conversation or chatting with Ms. Amador. But I would say the chatting was reduced a little bit . . . Like, for example, in the morning, when – for the general communication when I saw her, I would say 'Good morning,' and things like that. That kind of communication was not reduced." *Id.* at 97:4–13.

Lai shared with another co-worker, Leighton Ventura, but nobody else, that Chan was describing Amador as troublesome and annoying. *Id.* at 97:14–20. Although Amador suspects that Ventura stopped talking to her because of Chan's comments, Ventura testified that it was for personal reasons. Tantoy Decl., Ex. 13 (Ventura Dep. at 28:9–30:20). As for the other two incidents, SBE explains that it had implemented a "lunch buddy system" that prevented certain employees from taking lunch at the same time to ensure proper coverage in the office and that Amador's missed birthday was a simple oversight. *Id.* at 32:25–33:16; *see also* Richardson Decl. [Dkt. No. 66] ¶¶ 6–7, 13.

Amador's version of the events—that Ventura and Lai were ostracizing her because of Chan's comments, employees were purposefully not having lunch with her or celebrating her birthday, coupled with the discrimination claim evidence discussed above—fails to carry her burden to show that the hostility was pervasive and effectively changed the conditions of the her employment. Mere ostracism is insufficient to support a claim for hostile work environment. *Kelley v. The Conco Companies*, 196 Cal. App. 4th 191, 212 (2011); *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000). Nor has she shown that Chan "orchestrated" the harassment. *Kelley*, 196 Cal. App. 4th at 213. Such conduct and communications are not sufficiently severe and pervasive to constitute disability-based harassment. *See, e.g.*, *Haley v. Cohen & Steers Cap. Mgmt., Inc.*, 871 F. Supp. 2d 944, 958 (N.D. Cal. 2012) ("Plaintiff's reliance on conduct purportedly undertaken by Edlin in connection with his treatment of plaintiff on conference calls,

his performance-related statements and emails, and his decisions with respect to plaintiff's transfer and commission decisions, do not constitute qualifying verbal, physical, or visual harassment with respect to plaintiff's gender or disability.").

Moreover, Amador relies primarily upon her own testimony to support her harassment claim. Courts generally will not find the existence of a triable issue of material fact based only upon the uncorroborated and self-serving statements of the plaintiff. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). There is no evidence in the record from which a reasonable jury could conclude that Amador was subjected to severe and pervasive conduct on the basis of her disability that was sufficient to alter her working conditions. Accordingly, SBE's motion for summary judgment with respect to Amador's fourth cause of action for disability harassment is GRANTED.

## VII. PUNITIVE DAMAGES

As indicated above, the failure to provide reasonable accommodation, failure to engage in an interactive process, discrimination/retaliation based on failure to hire, and the derivative failure to prevent discrimination/retaliation claims survive summary judgment. SBE argues that it I should dismiss Amador's punitive damages claim as it pertains to these surviving claims.

Under California law, a plaintiff is entitled to punitive damages where he can show by "clear and convincing evidence[ ] that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Where the defendant is a corporation, the evidence must demonstrate that an officer, director, or managing agent committed, authorized, or ratified an act of malice, oppression, or fraud. *Id.*; *see also White v. Ultramar, Inc.*, 21 Cal. 4th 563, 572 (1999). A "managing agent," in turn, is defined as an employee "who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White*, 21 Cal. 4th at 573. "The scope of a corporate employee's discretion and authority" is "a question of fact for decision on a case-by-case basis." *Id.* at 567. However, "supervisory employees" typically are not considered managing agents under section 3294 unless they exercise "substantial discretionary authority over decisions that ultimately determine corporate policy over an aspect of the corporation's business." *Id.* at 579–80; *see also Lewis v. Dow Chem. Corp.*, No. 16-CV-06165-

YGR, 2018 WL 2267606, at *9 (N.D. Cal. May 17, 2018).

SBE asserts that Amador cannot recover punitive damages because there is no evidence that any of the main actors (Pace, Fischer, Chan, or Richardson) acted with "malice or oppression," engaged in "despicable conduct," or evidence that they, with the exception of Pace, were managing agents. To the extent that Pace, as the Clift's General Manager, acted as a managing agent, SBE argues that he had no knowledge of any adverse conduct against Amador, was not involved in the decision concerning an ergonomic study, and was unaware of Amador's complaints against Chan and Richardson. *See* Tantoy Decl., Ex. 5 (Pace Dep. at 76:13–77:4, 158:7–21).[10]

In opposition, Amador argues that a jury could find SBE liable for punitive damages based on the following three independent theories: SBE is liable for Pace's and Fischer's malicious conduct; Pace authorized the malicious conduct of Fischer and/or Chan; and/or Pace knew of the conduct of Fischer and/or Chan and adopted or approved it after it occurred. Those theories survive. There is ample evidence (including multiple email records) of Pace's involvement in the decision not to hire Amador during the May 2018 conversion. Even if Pace was not directly involved in the reasonable accommodation discussions, there is evidence that he was aware of the discussions between Amador, Fischer, Chan and Richardson. *See, e.g.*, Stephenson Decl., Ex. 39 (December 9, 2016 email from Pace to Fischer and Chan stating "it[']s time to seriously consider the automated system" in response to Fischer's email advising that Amador will be out sick for the day). With respect to whether Fischer can be considered a "managing agent," Amador has submitted evidence showing that Fischer "exercised substantial discretionary authority over [significant] aspects of [SBE's] business," so the punitive damages claim based on her conduct may survive. *See Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 370 (2013). The record also raises triable issues of fact on whether any of Pace, Fischer, Chan, or Richardson acted with malice or oppression.

Accordingly, I find that Amador has put forth sufficient evidence for a reasonable jury to

---

[10] SBE also argues their anti-discrimination/harassment/retaliation policies absolve them of liability for punitive damages but cites no case law to support such a broad claim.

conclude the SBE could be held liable for punitive damages.  SBE's motion for summary judgment with respect to the punitive damages claim is DENIED.

## CONCLUSION

SBE and Sonesta's motions for summary judgment are GRANTED in part and DENIED in part and Amador's motion for partial summary judgment is DENIED.  The failure to provide reasonable accommodation (COA 2), failure to engage in an interactive process (COA 3), discrimination/retaliation based on failure to hire (COA 1, 5, 7), and the derivative failure to prevent discrimination/retaliation claims (COA 6), along with questions about damages for those claims, survive summary judgment.  All other claims are dismissed.

**IT IS SO ORDERED.**

Dated: July 13, 2021

William H. Orrick
United States District Judge